<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        )
In re:                                  )
                                        )
TELESERVICES GROUP, INC.,               )
                                        )          Civil Action No. 09-1093 (GEB)
                    Debtor.             )
                                        )          **MEMORANDUM OPINION**
_____)
                                        )
BARRY W. FROST, Trustee in Bankruptcy,  )
                                        )
                    Plaintiff/Appellant,)
                                        )
           v.                           )
                                        )
JOHN X. ADILETTA, JANE DOE,             )
EXECUTOR ESTATE OF EUGENE               )
COLLINS, PAUL PATRIZIO, JOHN PRON,      )
corporation of the State of New Jersey, )
                                        )
                    Defendants/Appellees.)
                                        )
_____)

<u>**BROWN, Chief Judge**</u>

  This matter comes before the Court upon an appeal of Barry Frost, Trustee for the debtor

Teleservices Group, Inc., ("Trustee"), and upon a cross-appeal from defendants John X. Adiletta,

Jane Doe, Executor of the Estate of Eugene Collins, and Paul Patrizio (collectively "the Directors"

or "Defendants") from the February 10, 2009 Judgment of the United States Bankruptcy Court for

the District of New Jersey ("Bankruptcy Court"). (Record on Appeal ("ROA") 5206.)   The Court

has jurisdiction over this matter pursuant to 28 U.S.C. § 158.   The Court has considered the parties'

submissions and heard oral argument on November 17, 2009.  For the reasons that follow, the Court will affirm in part the Bankruptcy Court's February 10, 2009 Order and remand in part for clarification and further proceedings.


I.       BACKGROUND

These appeals involve an adversary proceeding that arose during the administration of the bankruptcy involving Teleservices Group, Inc. ("TSG").  The Trustee of TSG filed this appeal from an adversary proceeding, in which he sought damages that he claims TSG sustained and Defendants caused in their capacities as officers and directors of TSG.  The Trustee appeals from the Bankruptcy Court's order, in which it concluded that the business judgment rule applied to most of the charges brought against Defendants.  Defendants also filed a cross-appeal challenging the imposition of damages of $270,000.00, arguing that the Bankruptcy Judge was clearly erroneous in determining several issues of fact and that he erred in two conclusions of law.

The bankruptcy proceedings involved Defendants' failed business venture.  Defendants were the elected directors of TSG, a holding company, that was incorporated in May 2000.  Defendants created a Business Plan (ROA 76-97) in which they planned to purchase small telecommunications interconnect companies, located from Maine to Virginia, consolidate them, and then realize the efficiencies of the bigger, centrally managed company by spreading out the overhead.  (ROA5170.) They identified two companies, "core companies," that TSG would initially acquire, Tel@net Information Systems Corp. ("Tel@net") and Northeastern Communications, Inc. ("NCI").  TSG issued its Subscription Offering in May 2000, offering forty-five $100,000.00  "units" on an "all or none basis," with the goal of raising $4,500,000.00.  (Id.; ROA 220.)

2

The Business Plan also set forth the breakdown of how the $4,500,000.00 would be utilized. It provided that $2,650,000.00 would be used to acquire the core companies, $675,000.00 for advisory fees, and $575,000.00 for organizational expenses, leaving $600,000.00 as working capital. (ROA5171.)

During the time leading up to TSG's eventual bankruptcy, the Directors did not formally convene board meetings, and instead, they held informal meetings and met "based on the practicalities of the situation." (ROA5176.) TSG also opened two bank accounts, a concentration account that received all incoming funds generated for TSG by its subsidiaries, and a disbursement account that was used for accounts payable and expenses. (ROA5176.) The disbursement account was a zero-balance account, and money was transferred from the concentration account to the disbursement account to cover the distributions related to the expenses of Tel@net, NCI, and TSG. (ROA5176.)

TSG hired Apogee Partners, a corporation that was wholly owned by Defendant Patrizio, to facilitate its Subscription Offering and paid it $17,000.00 per month and $100,000.00 for its assistance in the closings of Tel@net and NCI. Apogee Partners helped to "raise[] and deposit[] a combined amount of $3,023,000 into TSG's concentration account." (ROA5171.) Apogee Partners did not record its meetings with investors, it did not account for any of the services that it provided to TSG, and it did not issue any reports or other written recommendations about investments. (ROA5176-5177.) In fact, Apogee Partners is not a licensed investment banking firm, but rather a management consulting firm. (ROA5177.) TSG, over two years, paid Apogee Partners $270,000.00 aside from the $100,000.00. Aside from the initial raise of $3,023,000, another $300,077.04 was deposited into the concentration account.

Rather than raising the $4,500,000.00 set forth in the Business Plan and Term Sheet of the Subscription Offering, TSG only raised $3,323,077.04.[1]   (ROA5171.)   TSG, nevertheless, implemented the Business Plan and acquired the core companies Tel@net and NCI.   (Id.)

Tel@net and the telecommunications equipment manufacturer NECAM ("NEC") had an operating dealership agreement ("Associate Agreement") in which Tel@net agreed to purchase and sell NEC's telecommunications products and NEC agreed to provide technical support services for the equipment.   The Associate Agreement further provided that when sent an invoice, Tel@net had sixty days in which to make payment to NEC.   (ROA5172.)   As a result of this extension of credit, NEC maintained a security interest in Tel@net's assets and inventory.   (ROA5173.)   The Associate Agreement predated the acquisition of Tel@net by TSG, and at the time of the acquisition, Tel@net was in default with NEC, being ninety days overdue, and owing $1,248,985.99.   As a result, Tel@net had agreed to relinquish the collateral to NEC and to cooperate with NEC.   (ROA5172-5173.)   TSG addressed this debt ("the outstanding debt") upon acquisition, and in January 2001 reached an agreement with NEC that TSG would assume the debt by way of a promissory note for $910,531.41, which covered the monies due from 1999 through November 2000. (ROA5173.)   The terms of the Associate Agreement apparently were also assumed.

Between August 2000 and August 2001, TSG on behalf of Tel@net purchased approximately $2,000,000.00 of telecommunications equipment from NEC.   (Id.)   The payments on this equipment were paid promptly, but TSG failed to make payments on the outstanding debt, and in July 2001, was in default of the total amount owed to NEC, approximately $1,268,000.00.   NEC, as a result,

---

[1]   This fact is a point of contention between the parties.   See infra Sections II.B.1.c.i and II.C.1.b.

terminated its Associate Agreement with Tele@net and exercised its rights pursuant to the agreement.  (Id.)  Because TSG did not have the cash on hand to satisfy the debt, TSG tried to negotiate with NEC, again, to satisfy the debt, and the parties agreed, on August 20, 2001, to the terms set forth in a Reinstatement Agreement.  (Id.)  This agreement, with conditions, reestablished the Associate Agreement.  Tel@net also was expected to pay the balance due, $1,347,250.00, in full by December 31, 2001. (ROA5173-5174.)  Yet again, however, Tel@net failed to make the payment and defaulted.  (ROA5174.)

During this same time period, TSG was considering the acquisition of a Virginia based telecommunication company, Property Technologies, Ltd., which was in Chapter 11 bankruptcy and for sale by the Trustee.  (Id.)  Prior to making the purchase, TSG formed OneNet, Inc. ("OneNet") as a wholly owned holding subsidiary of TSG, and through OneNet, raised $600,000.00 by taking a loan from two individuals named Greg Brady and Edwin Fitzgibbon ("Brady/Fitzgibbon Loan").  Pursuant to the terms of the Brady/Fitzgibbon Loan, half of the money, $300,000.00, would be used to partially pay TSG's debt to NEC, and the other half would be used as part of the purchase price of Property Technologies.  There was a thirty-six percent annual interest rate and an unlimited guarantee of payment.  Defendants also individually personally guaranteed repayment.  (Id.)  The acquisition of Property Technologies officially occurred on March 5, 2002, for $3,100,000.00, and at closing OneNet paid $1,200.000.00 in cash, including $300,000.00 from the Brady/Fitzgibbon Loan and $900,000.00 from the bank account of Property Technologies as approved by the Bankruptcy Court in Virginia.  (Id.)

Upon default of the Reinstatement Agreement, NEC exercised its rights pursuant to the agreement, and on April 2, 2002, demanded payment and requested information about collateral held

5

by TSG.  (ROA5175.)    Ultimately, however, a second restructuring agreement ("Second Restructuring Agreement") was signed on May 2, 2002, in which it was agreed that TSG would pay $350,000.00 upon the agreement's execution, and would pay the entire balance by July 31, 2002. TSG also signed an Affidavit Confessing Judgment pursuant to this agreement. (Id.)  TSG defaulted on the Second Restructuring Agreement, and within one month, NEC obtained an entry of judgment against TSG and Tel@net, and the collateral for the loans was surrendered to NEC.  The Bankruptcy Court determined that "at no time did Tel@net have the financial wherewithal to repay its longstanding debt to NEC" and TSG never "had sufficient cash on hand to satisfy the NEC debt, while also paying both current expenses and its obligations to the Tel@net Sellers." (ROA5175-5176.)

While the Business Plan stated that Defendant Adiletta would receive an annual salary of $240,000.00, that Defendant Collins would receive an annual salary of $200,000.00, and Defendant Patrizio would receive an annual salary of $180,000.00, during the two years Defendant Adiletta only received $279,175.00 out of $280,000.00, Defendant Collins only received $331,865.00 out of $400,000.00, and Patrizio, through Apogee Partners, which was wholly owned by Patrizio, received the $270,000.00 in fees.[2]  (ROA5177.)  Each Defendant also paid out $200,000.00, as each had personally guaranteed the Brady/Fitzgibbon Loan.  Defendant Adiletta further paid out $252,334.00 on behalf of TSG for Tel@net's payroll, legal fees and expenses and insurance, and Defendant Patrizio paid out $252,334.00 for the similar expenses. (Id.)

---

[2]      This fact is a point of contention between the parties.  See infra Sections II.B.1.c. vi and Section II.C.1.a.

## II.    DISCUSSION

### A.    Standard of Review

Bankruptcy Rule 8013 provides that the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . ." FED. R. BANKR. P. 8013.   A factual finding is clearly erroneous only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In re Cellnet Data Sys., Inc., 327 F.3d 242, 244 (3d Cir. 2003) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).   A Bankruptcy Court's conclusions of law, on the other hand, are reviewed de novo. Id.   Where mixed questions of law and fact are presented, the Court "afford[s] a clearly erroneous standard to integral facts, but exercis[es] plenary review of the lower court's interpretation and application of those facts to legal precepts." Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys. (In re CellNet Data Systems, Inc.), 327 F.3d 242, 244 (3d Cir. 2003) (citing In re Top Grade Sausage, Inc., 227 F.3d 123, 125 (3d Cir. 2000)).

Further, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the reviewing court, to be exercised on the facts of the individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976).  See also In re Weinberg, 197 Fed. Appx. 182, (3d Cir. Sept. 19, 2006) (stating that "'when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal,'" but that upon a showing of exceptional circumstances, an exception might be made at the district court's discretion).

## B.    TRUSTEE'S APPEAL

### 1.    The Bankruptcy Court Properly Applied the Business Judgment Rule and Dismissed Counts One, Two, Three, Four, Six, and Nine

#### a.    The Parties' Arguments

Trustee argues that the Bankruptcy Court erred in finding that the business judgment rule shielded review of the Defendants' decision to move forward with TSG's business plan, despite the failure to raise the $4,500,000.00 "all or none" subscription offering.  Trustee maintains that this was an error because it explicitly violated the terms of the subscription agreement, and therefore, amounted to conversion. Trustee avers that a constructive trust should have been imposed under the law, retaining the property for the investors, and had a constructive trust been imposed, then "TSG could not have received title to the misappropriated money in order to move forward with its business plan."  Trustee further argues that the Bankruptcy Court erred in its determination that Defendants did not breach their fiduciary duties to TSG and TSG's subsidiaries.  To this end, Trustee asserts that "Defendants were not entitled to the benefit of the business judgment rule as they were self-dealing, acted in bad faith and fraudulently misappropriated the property of third parties." Trustee argues that the Court should reverse the Bankruptcy Judge's dismissal of the first, second, third, fourth, sixth, and ninth causes of action due to the improper application of the business judgment rule.

In opposition to the motion, Defendants argue that the Court should affirm the conclusions of the Bankruptcy Court with respect to its application of the business judgment rule and that the claims that Trustee asserts on appeal "are mainly hindsight challenges to business decisions made by defendants in their capacity as directors of TSG." (Def.'s Opp. Br.) (Docket Entry No.13 at 24.) Defendants aver that "the Bankruptcy Court correctly invoked the business judgment rule, after

8

finding that the Trustee provided no evidence to rebut the rule's presumption and that the Defendants provided overwhelming evidence that the rule should be enforced." (Id. at 25.) Defendants address each of the causes of action dismissed in the adversary proceeding, specifically describing the questioned transactions that were the subject of each, and detail why the business judgment rule properly applied. (Id. at 26-33.) Defendants also argue that the Bankruptcy Court's holding, with respect to several other transactions called into question, should be affirmed because Trustee failed to provide sufficient evidence to sustain causes of action for gross negligence, breach of the duty of loyalty, or lack of good faith. (Id. at 34-46.) Defendants further maintain the Trustee's argument regarding conversion was not raised during the adversary proceeding, and that therefore, the Court should not now entertain it as it is untimely, but even if the Court addresses the issue, Defendants urge that the Court find it without merit because Plaintiff is without standing to assert it and the facts do not support the holding urged by Plaintiff. (Id. at 46-53.) Finally, Defendants aver that the Court should affirm the finding of the Bankruptcy Court that "the Trustee provided no evidence that the Defendants caused the demise of Tel@Net and no evidence of the value of Tel@Net," and that the lack of evidence of causation provides an independent reason to affirm the dismissal of each cause of action. (Id. at 53-55.)

In reply, Trustee argues that indeed the argument regarding conversion was raised before the Bankruptcy Court, but he "did not bring an action in conversion on behalf of the investors" because the Trustee is not the express representative of the subscription investors. (Docket Entry No. 17 at 5.) Trustee reiterates its argument that "[w]hile the [Bankruptcy Court] technically found that a conversion had occurred by finding that only $3,434,077.04 had been raised," it nevertheless "did not remove the benefits of the 'business judgment rule'" and this "egregious error" requires reversal.

9

(Id. at 6.)  Trustee maintains that the evidence before the Bankruptcy Court shows that the business plan of TSG could not have been implemented with the alleged converted subscription monies; that neither Apogee Partners nor Apogee Holdings was an investment bank, and therefore, Apogee was not entitled to the $200,000.00 payment; that there is no accounting or other evidence to substantiate the claim that during August and September, 2000, alleged "net" proceeds were deposited into TSG's bank account; that the evidence submitted is contradictory in that it is asserted that some expenses were paid in cash and it is also asserted that Defendants did not receive any cash; that the lack of formal board meetings evidences the intent to defraud investors and conceal the actual happenings within the enterprise; that the defendants "had no knowledge of corporate finances at any time during the commercial viability of TSG" despite the maintenance of a general ledger; that it is a "misstatement" to characterize Defendant Patrizio "as a salaried employee of TSG 'through Apogee'" because he "was never an employee of TSG" as "[h]is sole employment was with Apogee;" that Defendant "Patrizio's earnings from Apogee were not before the [Bankruptcy Court] for examination and the defendants can not take issue with a non-issue;" that "defendants had the money to pay NEC" but "chose not to . . . and intentionally destroy[] TSG's only profitable asset;" and that "[t]he purchase of Property Technologies . . . served only to deepen the prior insolvency of TSG" and was "an immediate drain on TSG's limited resources."  (Id. at 7-15.)   Trustee also reiterates its argument that Defendants were not entitled to the business judgment rule because TSG failed to raise the $4.5 million under the business plan, an "all-or-none" subscription offering, and Defendants' subsequent fraudulent misrepresentations that the full amount had been raised does not alter the fact that they were not entitled to keep the money for use in the business because a constructive trust resulted as a matter of law as "both legal and equitable title to the subscription

10

money remained with the subscription investors." (Id. at 15-16.)

For these reasons, Trustee argues that the dismissal of Counts One, Two, Three, Four, and Nine should be reversed and that he "is entitled to judgment." (Id. at 17.) Defendants argue that the Bankruptcy Court erred in finding that "the alleged injuries sustained by Tel@Net Sellers are beyond the scope of this matter" because that entity "continue[s] to be [a] creditor[] of TSG" and "are represented by the Trustee in this action." (Id.) (emphasis, internal quotes, and citations omitted). Trustee asserts that "[w]hen a corporation is insolvent or enters the vicinity of insolvency the fiduciary duties of directors expand to include creditors." (Id. at 18) (citation omitted). Trustee argues that "the [B]ankruptcy [C]ourt did not account for the fact that TSG was insolvent" when it dismissed Counts One, Two, Three, Four, and Nine. (Id. at 22.) With regard to the findings and conclusions involving Apogee Partners, Trustee argues that "[t]he judgment award of $270,000 should be increased to at least $470,000 [to account for the investment banking fee] and augmented by the value of additional TSG stock of $400,000 provided to the defendants, requiring, at the very least, a collective judgment of $870,000, plus interest and costs." (Id. at 26.)

### b.       Relevant Principles of Law

#### i.       The Business Judgment Rule

"[T]he business judgment rule provides directors with a 'powerful presumption[],'" "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" In re Merck & Co. Sec., Derivative & ERISA Litig., 493 F.3d 393, 402 (3d Cir. 2007) (citing Rales v. Blasband,

11

634 A.2d 927, 933 (Del. 1993); Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).  "The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." Parnes v. Bally Entm't Corp., 722 A.2d 1242, 1246 (Del. 1999). The business judgment rule "shield[s] internal business decisions from second-guessing by the courts" and "[u]nder the rule, when business judgments are made in good faith based on reasonable business knowledge, the decision makers are immune from liability from actions brought by others who have an interest in the business entity." Green Party v. Hartz Mt. Indus., 164 N.J. 127, 147 (N.J. 2000) (citing Courts at Beachgate v. Bird, 226 N.J. Super. 631, 641 (Ch. Div. 1988); Sarner v. Sarner, 62 N.J. Super. 41, 60 (App. Div. 1960)).

When applying the business judgment rule to a particular case, the district court makes the following inquiry.  Because "[t]he business judgment rule 'is a rebuttable presumption[,] [i]t places an initial burden on the person who challenges a corporate decision to demonstrate the decision-maker's 'self-dealing or other disabling factor.'  If a challenger sustains that initial burden, then the 'presumption of the rule is . . . rebutted, and the burden of proof shifts to the . . . defendants to show that the transaction was, in fact, fair to the company.'" In re PSE&G Shareholder Litig., 173 N.J. 258, 277 (2002) (citations omitted).  "Overcoming the presumptions of the business judgment rule on the merits is a near-Herclean task" as "the burden . . . is to show irrationality." Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005).

ii.     Fiduciary Duties

Pursuant to New Jersey law, directors of a corporation are to "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent people would exercise under similar circumstances in like positions."  N.J.S.A. §14A:6-14.  "Where a director in fact exercises a good faith effort to be informed and to exercise appropriate judgment, he or she should be deemed to satisfy fully the duty of [care]."  In re Caremark Int'l Inc. Derivitative Litig., 698 A.2d 959, 968 (Del. Ch. 1996).  "[D]ue care in the decision[]making context is process due care only.

. . . Substantive review of business decisions . . . is effected when decisions are tested for bad faith or waste."  Stanziale v. Nachtomi, 416 F.3d at 240 (citations and internal quotes omitted).  "[T]o invoke the [business judgment] rule's protections in the context of a duty of care, 'directors have a duty to inform themselves, prior to making a business decision, of all material reasonably available to them.'"  Bridgeport Holdings Inc. Liquidating Trust v. Boyer, 388 B.R. 548, 564 (Bankr. D. Del. 2008) (citing Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 367 (Del. 1993)).  In so determining whether a decision was adequately informed under the law, a court should apply a gross negligence standard.  Id.  See also Maul v. Kirkman, 270 N.J. Super. 596, 614 (App. Div. 1994).

"Fiduciaries breach their duty of loyalty by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties."  Bridgeport Holdings Inc. Liquidating Trust v. Boyer, 388 B.R. at 564(citing Stone v. Ritter, 911 A.2d 362, 369 (Del. 2006)).  "The duty of loyalty requires that the best interests of the corporation and its shareholders take precedence over any self-interest of a director, officer, or controlling shareholder that is not shared by the stockholders generally.  McCall v. Scott, 239 F.3d 808, 824 (6th Cir. 2001).

The threshold inquiry in assessing whether a director violated his duty of loyalty is whether the director has a conflicting interest in the transaction.  Directors are

13

considered to be interested if they either appear on both sides of a transaction []or expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

Seidman v. Office of Thrift Supervision, Dep't of the Treasury (In re Seidman), 37 F.3d 911, 934 (3d Cir. 1994)(citation and internal quotes omitted).  The responsibility to act in good faith is "embraced" within both the duty of loyalty and the duty of care.  Guttman v. Huang, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (stating that "[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest").


### c.    Issues on Appeal

This Court will now address those parts of the Bankruptcy Court's holding, which relate to the arguments made by Trustee on appeal.   Trustee does not specifically argue what part of the Bankruptcy Court's decision is flawed, but rather, seemingly asserts that based on consideration of the facts, the Bankruptcy Judge reached the wrong result.  However, Trustee fails to direct the Court to any cases in particular that were improperly relied upon or were improperly construed.


### i.    Failure to raise the $4.5 million

As the Court previously noted, the Trustee argues on appeal that the failure to raise the $4.5 million amounted to conversion.  In reviewing the record, the Court notes that the Trustee raised a similar issue before the Bankruptcy Court in its reply in support of its motion for summary judgment. (ROA 3549.)  In support of the similar position, the Trustee argued below that "the plaintiff has proven that the defendants did not consummate the 'all or none' $4.5 million dollar raise," that

14

"[b]acking into a net figure which approximates what might have been remaining after expenses of a raise is not the equivalent of raising 4.5 million," that "[r]aising any amount less [than] 4.5 million dollars, even $10.00 less, mandated a return of the investor money resulting in the non-purchase of the core corporations," that "defendants practiced a fraud upon the investors by not returning all the money," and that the business judgment rule's protection is not available to the directors in this matter because it "does not apply to situations involving fraud, self dealing, bad faith, a breach of the duty of care and more." (ROA 3549-3552.) The Trustee further argued that "[t]aking control of the investor money and utilizing the same in violation of the subscription agreement was and continues to be a conversion of the investors' money." (ROA3554.) Unlike the present argument that has been asserted on appeal, the Trustee did not argue before the Bankruptcy Court that a constructive trust should have been formed after failing to raise the entire amount and that therefore, the Trustee would have standing to assert this argument as the trustee for the constructive trust.

The Bankruptcy Court, in relevant part, stated the following with respect to the issue:

> In support of the claim regarding TSG's lack of capital, the Trustee proffers evidence showing that Defendants failed to raise exactly $4.5 million (as reflected in the Subscription Offering) before implementing the Business Plan. TSG's Subscription Offering called for an initial capital raise of $4.5 million, $600,000 of which was designated as "working capital." After converting Defendants' salaries into stock, paying investment fees, and acquiring the "core companies," TSG has working capital in the amount of $564,831 – quite close to the $600,000 amount projected in the Subscription Offering; thus, TSG has sufficient working capital.

> More importantly, however, the Court fails to see how this minor deficiency breached Defendants' duty of care. . . . Naturally, TSG could not generate any profit were it not first placed into existence. More pointedly, TSG could not have acquired any "core companies" – the working force for TSG – without implementing the Business Plan. Besides alleging that TSG damaged its potential to raise more funds and damaged the good will of the "core companies," the Trustee has failed to show that the TSG Directors' decision to implement the Business Plan prematurely was

made without exercising judgment on an informed basis. The very act of coordinating and implementing the Business Plan implies that some process was conducted. The Court finds that Defendants used due care in reaching these decisions.

Additionally, the Court notes that even without the protection of the business judgment rule, Defendants' actions could not have conceptually damaged or harmed TSG. The Trustee has not linked the alleged misrepresentations in the initial capital raise (or the conversion of Defendants' salary into stock) as being an actual or proximate cause of harm to TSG. The Trustee only has claimed, not proven, that the failure to actually raise $4.5 million rendered TSG insolvent <u>ab initio</u> and, therefore, as the Trustee says, "resulted in the immediate insolvency of Tel@net . . . ." Trustee's Complaint, ¶70.) The Court does not agree. These alleged misrepresentations are beyond the scope of this matter, and any alleged injuries sustained by the Tel@net Sellers are being heard before another court of law. <u>See Marrone, et al. v. Teleservices Group, Inc., et al.</u>, case no 02-cv-5763 (TCP) (E.D.N.Y.).

(ROA 5186-87.)

At oral argument, Trustee clarified its argument, and stated that it has standing to assert these claims not as trustee for the bankrupt estate, but rather, as the trustee for the constructive trust that resulted from the alleged conversion. Trustee also clarified that the original investors did not participate or file claim in the main bankruptcy proceedings. The Court notes that while Trustee raised the conversion theory in the adversary proceeding, Trustee did not argue that a constructive trust should have resulted due to the conversion, and as a result, the Bankruptcy Court did not have the opportunity to opine. Trustee has not argued that any exceptional circumstance exists to warrant this Court's consideration of the issue for the first time. Therefore, the Court exercises its discretion and concludes that even if Trustee has standing to assert its argument as the trustee of the constructive trust, the Court will not consider Trustee's argument for the first time on appeal. <u>See Singleton v. Wulff</u>, 428 U.S. 106, 121 (1976); <u>In re Weinberg</u>, 197 Fed. Appx. 182, (3d Cir. Sept.

16

19, 2006).

    ii.    <u>Whether the Bankruptcy Court erred in Dismissing Count One</u>

Count One of the Amended Complaint asserts a claim against Defendants for breaching their fiduciary duties of care owed to TSG when acting on behalf of TSG, they: (1) caused the purchase of Tel@net and NCI "knowing that [TSG] would not have the money to make payment on the Seller notes of Tel@net and [NCI], giving the prior stockholders of Tel@net and [NCI] the right to declare immediate default and redeem their stock ownership, leaving [TSG] with investor debt and no assets;" (2) launched TSG "without the capital to pay its own expenses and or the ordinary business expenses of its subsidiaries, leading to the immediate insolvency of the newly purchased, theretofore profitable, subsidiary corporations;" (3) failed to convene meetings of the Board of Directors leading to the decision to purchase Property Technologies rather than pay debts associated with Tel@net and NEC and leading to the execution of the Second Restructuring Agreement and Confession of Judgment of May 2, 2002; (4) failed to adhere to the Business Plan; (5) maintained a flawed accounting system; (6) decided not to file for Chapter 11 bankruptcy for Tel@net or TSG; and (7) failed to hold a board of directors meeting for Tel@net. (ROA 56-60.)

<u>The Purchase of Tel@net and NCI</u>.  With respect to the decision to purchase Tel@net, Trustee alleges that the breach occurred due to the conversion of the initial investors' money and using it without the intent of ever paying it back.  (<u>Id.</u>)  On appeal, the Trustee does not state how the Bankruptcy Judge erred specifically, but rather, generally argues in support of a result contrary to that stated in the written opinion issued by the Bankruptcy Judge, with the heading in his brief, "THE COURT MUST REVERSE THE BANKRUPTCY COURT'S DISMISSAL OF

17

PLAINTIFF'S CAUSES OF ACTION." (Id. at 27.)  The Court interprets the Trustee's argument as being that the Bankruptcy Court reached the wrong result, and that this Court should instead consider the record and find in favor of the Trustee.

The Bankruptcy Court held that the Trustee failed to rebut the presumption of the business judgment rule, and that accordingly, the protections afforded to the decisions alleged in Count One must be honored.  The Bankruptcy Court also held that even if it found that the Trustee had successfully rebutted the presumption, the decisions and actions that the Trustee alleges would not constitute a breach of the duty of care. The Bankruptcy Judge relevantly stated:

> The Trustee has only claimed, not proven, that the failure to actually raise $4.5 million rendered TSG insolvent ab initio and, therefore, as the Trustee says, "resulted in the immediate insolvency of Tel@net . . . ." Trustee's Complaint ¶70.  The Court does not agree.  These alleged misrepresentations are beyond the scope of this matter, and any alleged injuries sustained by the Tel@net Sellers are being heard before another court of law.  See Marrone, et al. v. Teleservices Group, Inc., et al., case no. 02-cv-5763 (TCP)(E.D.N.Y.).

> . . . .

> Turning to TSG's concentration account, the Trustee asserts that TSG's flawed centralized cash management system rendered the TSG Directors unable to monitor the performance of the subsidiaries.  The Court disagrees for a variety of reasons.  First, the Trustee has not directed the Court to New Jersey case or statutory law prohibiting a parent corporation from using a single concentration account to consolidate and operate the finances of its subsidiaries. . . . [T]he Court will not conclude that the mere use of a concentration account violated the TSG Director's duty of care to TSG.

> Second, TSG disclosed the use of its centralized cash management system.  All investors were aware of the concentration account.  Indeed, TSG was founded with the notion of integrating interconnect communication companies into one entity – utilizing a centralized cash management system simply follows in suit.  The Court considers TSG's cash management system to be "a function of administrative convenience and economy," rather than a breach of Defendants' duty of care.[] . . .

> Third, Defendants have certified that TSG kept the books and records in accordance
> with General Accepted Accounting Principles – the Trustee has not rebutted that
> claim.  Payables and receivable ledgers were kept for each company. . . .  In sum, the
> Trustee has not presented sufficient evidence to persuade the Court that Defendants
> breached their duty of care <u>owed to TSG</u> by operating its finances through a single
> concentration account.

(ROA5187-5188.)

On appeal, the Trustee has failed to point to any particular error but rather argues that the Bankruptcy Court reached the wrong result.  The Court does not agree.  The Bankruptcy Court properly applied the facts to the relevant law, determined that the business judgment rule applies, that the presumption was not rebutted, and that as a result, Count One should be dismissed.

<u>All Other Allegations Supporting Cause of Action pursuant to Count One</u>.  Upon the Court's review of the same, including that Defendants held weekly informal meetings and had many, substantial conversations about TSG and its subsidiaries, that their accounting system was in compliance with Generally Accepted Accounting Procedures ("GAAP"), that there is no evidence that Defendants were on both sides of the purchase of Property Technologies, and the extent of the negotiations with NEC, the Court comes to the same conclusion as the Bankruptcy Court.  The Trustee has failed to meet its "near-Herclean" burden to overcome the presumptions of the business judgment rule. <u>Stanziale v. Nachtomi</u>, 416 F.3d at 238.  The Trustee has argued, basically, that the Bankruptcy Court reached the wrong result.  Because this Court agrees with the Bankruptcy Court's assessment entirely, the Court will affirm the decision.

iii.     <u>Whether the Bankruptcy Court erred in Dismissing Count Two</u>

Count Two of the Amended Complaint asserts a claim against Defendants for breaching their fiduciary duty of loyalty to TSG by assuming seventy percent ownership of TSG stock without paying any money for it, by "disregarding" other stockholders and creditors, and by gambling their stock interest for seventy percent of the reward.  (ROA61.)

The Bankruptcy Court relevantly stated:

> First, the Trustee has not directed the Court to New Jersey statutory or case law that requires stocks to be purchased exclusively by way of cash.  The Trustee has not shown the Court that other forms of consideration, such as labor or property or future promises of both, are impermissible under New Jersey law.  Defendants, on the other hand, have demonstrated that the TSG Directors worked in furtherance of promoting TSG . . .; that the TSG Directors deferred their salaries; and that Defendants used personal funds – all of which negate a finding of self-dealing or that Defendants worked "with a material financial interest which conflicted with [their] fiduciary duties." . . .  Second, the Trustee has not explained or established how Defendants disregarded TSG investors, nor how Defendants breached their duty of loyalty to the investors.  Accordingly, the Court summarily dismisses this Count.

(ROA5200.)

The Trustee has failed to assert any specific error made by the Bankruptcy Court or point out any legal authority to undermine the Bankruptcy Court's decision.  Rather, the Trustee argues that the Bankruptcy Court reached the wrong result. The Court does not agree.  The Bankruptcy Court properly applied the facts to the relevant law, and therefore, the Court affirms the dismissal of Count Two.

      iv.    <u>Whether the Bankruptcy Court erred in Dismissing Count Three</u>

Count Three of the Amended Complaint asserts a claim against Defendants for failing to act "in what they believed was in [TSG's] best interest" and thereby breaching the duty of good faith by failing to pay the Dime Savings Bank line of credit, failing to pay NEC, and by having a flawed

accounting system without changing it.  (ROA62.)

The Bankruptcy Court relevantly stated:

> The Trustee neither has pointed to specific facts, nor arranged a cohesive legal argument for the Court to render a finding of bad faith.  The Trustee has not presented the Court with instances where Defendants acted intentionally to harm TSG; to violate positive law; or to consciously disregard fiduciary duties.  On the contrary, the facts show that the TSG Directors were attempting to advance TSG's corporate welfare by maintaining Tel@net's relationship with NEC and by acquiring Property Technologies, which were both consistent with TSG's Business Plan.  The Trustee's assertions and bald legal arguments cannot rebut the business judgment rule's presumption of good faith.  The fact that TSG did not prove to be a successfully business venture in the long run does not mean that Defendants acted in bad faith.

(ROA5201.)

On appeal, the Trustee has failed to point to any particular error but rather argues that the Bankruptcy Court reached the wrong result.  The Court concludes that the accounting system was not flawed and that it was fully compliant with GAMP.  Further, the business judgment rule's protections have not been rebutted.  The Bankruptcy Court properly applied the facts to the relevant law, and therefore, the Court affirms the dismissal of Count Three.

v.   <u>Whether the Bankruptcy Court erred in Dismissing Count Four</u>

Count Four of the Amended Complaint asserts a claim against Defendants based upon the same reasons that were alleged in Count One, and that this amounts to willful, wanton, and grossly negligent conduct.  (ROA 63.)

Under New Jersey law, actions amount to gross negligence when they demonstrate

"indifference to consequences." Parks v. Pep Boys, 282 N.J. Super. 1, 17 (App. Div. 1995).  For the same reasons that the Court found no error in the Bankruptcy Court's application of facts to law regarding Count One, the Court likewise affirms the Bankruptcy Court's dismissal of Count Four.

vi.     Whether the Bankruptcy Court erred in Dismissing Count Six

Count Six of the Amended Complaint asserts a claim against Defendants for converting and/or misappropriating the gross revenues of the subsidiary corporations to pay their own salaries. (ROA 64.)

The Bankruptcy Court relevantly stated:

Upon review of the record and legal arguments, the Trustee has not provided the Court with statutory or doctrinal precedent to support the claim.  The Trustee's claim essentially mirrors Count I.f, which faults TSG's accounting system.  As mentioned above, Defendants did not breach a duty owing to TSG regarding corporate accounting. Additionally, to the extent the Trustee's argument relates to Defendants' receipt of compensation for their efforts, the Court has already held that, with the exception of Apogee Partners, compensation was disclosed, appropriate, and presumed appropriate by way of the business judgment rule.  Due to the fact that the Trustee has not presented any legal argument whatsoever linking the alleged breaches as the cause for the alleged harm, and due to the fact that the Court finds that TSG utilized a cash-management system consistent with TSG's business model, the Court summarily dismisses Count [Six].

(ROA5201-02.)

On appeal, the Trustee has failed to point to any particular error but rather argues that the Bankruptcy Court reached the wrong result.  The Court does not agree.  The Bankruptcy Court

properly applied the facts[3] to the relevant law.  Specifically, the Bankruptcy Court found that these salaries were disclosed to investors in the Business Plan, and that Defendants, collectively, spent substantial time conducting business for TSG.  Further, to the extent that the Trustee has for the first time raised the issue that "because the Defendants' allegedly converted the investors' money, they should not be permitted to benefit from their alleged wrongdoing" the Court will exercise its discretion and will not consider it for the first time on appeal.

vii.    Whether the Bankruptcy Court erred in Dismissing Count Nine

Count Nine of the Amended Complaint asserts a claim against Defendants for a breach of the duty of loyalty for self-dealing because they paid Collins and Associates more than $110,000.00, paid Apogee Partners $200,000.00, withdrew money from TSG's concentration account without providing any explanation, and used corporate money to pay for a membership to a golf club and to pay their salaries but failing to spend sufficient time on the business.  (ROA45-46.)

The Bankruptcy Court found partially in favor of the Trustee as it relates to Count Nine of the Amended Complaint.  Specifically, the Bankruptcy Court determined that the business judgment rule had been successfully rebutted regarding the payments made to Apogee Partners and "was paid regardless of whether it performed any services."  (ROA 5197.)  Accordingly, the Bankruptcy Court held that the payments to Apogee Partners totaling $270,000.00 "for illusory services" amounted to a breach of the duty of loyalty, and accordingly, the Directors were found liable for that amount.

---

[3]    The Court notes that this point is interconnected with an issue raised in Defendants' appeal regarding Defendant Patrizio's salary.

However, the Bankruptcy Court determined that the Trustee had failed to provide sufficient evidence to substantiate the claim or rebut the presumption of good faith of the business judgment rule concerning Collins and Associates, withdrawing funds without explanation, joining a golf club, or failing to spend an adequate amount of time engaging in business activities thus justifying their salaries.  (ROA 5198-99.)   The Trustee appeals from that portion of the decision that found in Defendants' favor.

However, the Trustee has failed to point to any particular error and simply argues that the Bankruptcy Court reached the wrong result.  The Court does not agree.  The Bankruptcy Court properly applied the facts to the relevant law.   Specifically, the Court reviewed the record and concurs that the Bankruptcy Court properly found the following facts did not support a conclusion that Defendants breached their duty of loyalty: (1) there was no evidence presented that withdrawals from the corporate account were improper or for improper purposes; (2) there was no evidence TSG did not benefit from the payments to Collins & Associates; (3) the golf club membership was a valid expense; and (4) Defendants were entitled to keep whatever salaries that they were paid for their work as employees of TSG.

### C.    DEFENDANTS' CROSS-APPEAL

#### 1.    Whether the Bankruptcy Court erred in any of its Findings of Fact

Defendants argue that "the $270,000.00 judgment . . . should be reversed because it is based on a clear error of fact concerning the compensation paid to Apogee and Patrizio.  Defendants also argue that the Bankruptcy Court's finding that "TSG did not raise $4.5 million is based on a clear

error of fact and should be reversed."  Defendants aver that "at a minimum, the Court should remand the matter to the Bankruptcy Court for the limited purpose of clarifying the fact findings that form the basis of the judgment against the Defendants and permitting the Bankruptcy Court to amend its ruling to conform to the facts."

The Trustee argues that the finding that $4.5 million was not raised is a material finding and that it should not be stricken, that the alleged payments that were made prior to deposit are not supported by any evidence in the record, that Patrizio chose not to become an employee of TSG and therefore should not be compensated as an employee retroactively, and that Patrizio specifically chose not to keep any records of any payments "so he would not be required to account."  (Docket Entry No. 14.)  The Trustee also argues that there is "no evidence that would support a conclusion that Patrizio received a TSG salary through Apogee Partners."  (Id. at 9.)

### a.    Findings regarding Patrizio's Salary

The Bankruptcy Court relevantly made the following findings of fact regarding the money paid to Defendant Patrizio and Apogee Partners: (1) "Patrizio, as Chairman of the Board, Secretary, and Director, was scheduled to receive an annual salary in the amount of $180,000;" (2) regarding Patrizio, "the record is not clear; however Apogee Partners, wholly owned by Patrizio, received $270,000;" and (3) "After two years in existence, TSG paid Apogee Partners approximately $270,000, apart from the $100,000 received for its role in TSG's initial capital raise."  (ROA5177-78.)

It appears that the issue lies in the fact that there is no finding that Patrizio directly received

any salary from TSG, but the Court found that such salary was rightful should he have received it. On the other hand, Patrizio may have been paid a salary through Apogee Partners, but the Bankruptcy Court ordered that the amount paid from TSG to Apogee Partners was a violation of the duty of loyalty. Defendants argue that unlike the other Defendants, Patrizio was improperly stripped of his salary because the only way that he was compensated for his work through TSG was through Apogee Partners. However, as the parties agreed at oral argument, there is no evidence in the record of the specific amount of salary that Patrizio was paid through Apogee Partners. The Court concludes that whether Apogee Partners compensated Patrizio in some way is not relevant to this litigation. Rather, the issue is whether TSG properly compensated Patrizio. The Bankruptcy Court properly found there is no evidence that TSG paid any amount of salary to Patrizio. However, if Patrizio believed that TSG owed him money in back-salary, he could have filed as a creditor to the estate. The Court will not ignore the breach of fiduciary duties with respect to the use of Apogee Partners in an effort to ensure that Patrizio is properly compensated. The Bankruptcy Court did not err in this respect, and therefore, the Court affirms its decision.

**b.      Finding that TSG did not Raise $4.5 Million.**

Defendants argue that the Bankruptcy Court's finding that TSG failed to raise $4.5 million is clearly erroneous and should be reversed. (Docket Entry No. 7 at 36.) Defendants make this argument due to the implications that the finding may have in the matter currently in the Eastern District of New York involving the Tel@net Sellers. (Id.) (citing In re DES Litig., 7 F.3d 20, 23-25 (2d Cir. 1993)). Defendants argue that "[a]lthough a prevailing party on an issue generally cannot

appeal, two exceptions are recognized: (i) where the finding may have collateral estoppel effects and (ii) where the appealing party, though prevailing below, is nonetheless still aggrieved by the ruling". (Id.)  Defendants argue that the finding is clearly erroneous insofar as it is based the improper inference that "because $4.5 million was not deposited into the TSG Concentration Account," $4.5 million was not raised.  Defendants aver that the evidence is actually lacking to support such a conclusion.  Defendants argue that the amount deposited into the concentration account was a net amount and that certain fees and expenses had been paid prior to deposit.  Defendants argue that the Court should find instead that the $4.5 million was raised in full.  (Id. at 41.)  Alternatively, Defendants assert that because "[t]he finding is not essential to the Bankruptcy Court's ruling" "all references to the Defendants not raising $4.5 million should be deleted from the Opinion" because "[t]he finding is not essential to the . . . ruling."  (Id.)

The Trustee argues that "[t]here is not a scintilla of factual evidence in the appellate record which would substantiate defendants' unfounded argument that $4.5 million . . . had been raised." (Docket Entry No. 18.)  The Trustee points to the record in support of the finding that it was not raised, and that some number less than $4.5 million was in actuality raised.  (Id.)  The Trustee maintains that the Bankruptcy Court "rejected defendants' argument that 4.5 million dollars had been raised," and that the same result should occur on appeal.  (Id.)

The Bankruptcy Court made the following relevant finding of fact: "TSG raised only $3,323,077.04 of its intended 'all or none' $4.5 million projection.  TSG did not raise $4.5 million." (ROA5171.)  In support of this finding, the Bankruptcy Court cited the Certification of Defendant Patrizio at paragraphs 6-8 and Exhibit A, attached to the Certification.

The Patrizio Certification states:

6.  Apogee collected most of the investor funds resulting from TSG's initial stock offering and deposited net proceeds (i.e., less approved and disclosed expenses such as broker's fees) into the TSG bank account.  TSG bank records show that in August 2000, Apogee made deposits of $2,600,000 and $253,250 into TSG's account on August 21 and August 28, respectively.  In September 2000, Apogee made deposits of $100,000 and $69,750 into the TSG account on September 11 and September 15, respectively.  It is my recollection that these September deposits were made later because some funds from overseas investors had to clear.  A true and correct copy of TSG's bank statements for August 2000 and September 2000 are attached hereto as Exhibit A.

7.  TSG bank records also show a deposit of $300,077.04 made on August 18, 2000. This deposit was not made by Apogee, but represented net investor funds received from other sources.  See, Exhibit A.

8.  In total, the bank records show that investor funds from the initial raise totaling $3,323,077.04 were deposited into the TSG accounts.  This amount is net of certain expenses.

(ROA3726-27.)  Exhibit B, attached to the Patrizio Certification, is "analysis showing the manner in which the initial capital was utilized," and it states that the broker fees totaled $675,000, transaction costs totaled $250,169, and organization fees totaled $250,000.  (ROA3740.)  Further, pursuant to the Certification, while Exhibit B states that $200,000 was paid to Apogee for an investment banking fee, this amount was paid in stock.  (ROA3727.)

Even if the Court were to conclude that Defendants raised more than the amount deposited into the concentration account, it does not necessarily follow that TSG raised the "all or none" $4.5 million.  Further, the record does not provide this Court with a clear understanding of what expenses were paid before the net amount was deposited into the concentration account or whether these payments were contemplated in the business plan.  To further complicate matters, the record is void

28

of reference to a list of initial investors or reference to a bank account from which these alleged expenses were paid. Having reviewed the record and the Bankruptcy Court's opinion, the Court agrees that the evidence does not show that Defendants raised $4.5 million, that there are some inconsistencies regarding the actual amount raised and units sold,[4] and that the findings of fact made by the Bankruptcy Court may or may not be relevant to the final determination.  The Bankruptcy Court is in a better position to decide whether or not to clarify the findings of fact, or alternatively, to strike these references from the written opinion.  Therefore, the Court will remand this matter to the Bankruptcy Court on this issue for clarification and further proceedings on this point.

### 2.   Whether the Bankruptcy Court erred in dismissing Defendant's Motion to Alter Judgment because it was not timely filed

Defendants argue that "the Bankruptcy Court improperly raised the timeliness issue sua sponte, to deny the Defendants' Motion to Alter Judgment on procedural grounds, and that because the Trustee failed to raise the timeliness issue himself, the Bankruptcy Court should have considered the motion's merits and tolled the time for Defendants' cross appeal.  (Docket Entry No. 7 at 45.)

The Trustee argues that the Bankruptcy Court entered judgment in the instant matter on February 10, 2009 (ROA5205), that a Motion to Amend Judgment was filed on February 25, 2009 (ROA5227), and that Notice of Appeal was filed on March 11, 2009 (Docket Entry No. 1).  On

---

[4]   For example, if the gross amount raised was $4.5 million, after deducting the itemized costs excluding the amount paid in stock, as it is outlined in Exhibit B, the net amount deposited would be $3,999,156.  Of course, this assumes that certain expenses were paid prior to deposit, as Defendants claim.  This net amount, however, does not reconcile with the amount deposited in the account, $3,323,077.04, even if all these expenses were paid out prior to deposit. Therefore, these inconsistencies may or may not be clarified on remand, if the Bankruptcy Court concludes that such determinations are necessary to the resolution of the matter.

March 31, 2009, an order was filed denying the motion, but it did not state the grounds upon which the decision was based.  (ROA5362-63.)  In a letter dated April 1, 2009, Defendants' attorney wrote a letter to the Bankruptcy Judge in order "to make sure that the grounds upon which defendants moved to extent the time to file a cross-appeal, as well as the factual basis for Your Honor's findings, are part of the record," and further stating that "Your Honor found that defendants filed their motion to amend the opinion and judgment more than ten days after the judgment had been entered," pursuant to Bankruptcy Rule 9006(a).  (ROA 5365.)

A Motion to Alter or Amend Judgment is governed by Federal Rule of Procedure 59(e), which states: "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).[5]  Bankruptcy Rule 9006 addresses how to compute the ten days, stating that "[i]n computing any period of time prescribed . . . by the Federal Rules of Civil Procedure . . . the day of the act, event, or default from which the designated period of time begins to run shall not be included" and that Saturdays, Sundays, and legal holidays are included except where the period of time is less than eight days.  U.S.C.S. Bankruptcy R. 9006(a).

The Court disagrees with Defendants' arguments.  "A motion to alter or amend a judgment must be filed within 10 days of the entry of a judgment.  This time period is jurisdictional and may not be extended."  10 Collier on Bankruptcy §9023.07 (2009) (footnotes omitted).  See also In re American Int'l Airways, Inc., 69 B.R. 396, 396 n.1 (Bankr. E.D. Pa 1987) (stating that "any Motion

---

[5]      Bankruptcy Rule 9023 likewise provided in bankruptcy cases that a motion for reconsideration must be filed no later than 10 days after the entry of judgment.  U.S.C.S. Bankruptcy R. 9023.  Rule 9023, as of December 1, 2009, changes the period in which one can timely file a Motion to Alter Judgment to fourteen days, rather than ten.  This change is not relevant to the instant inquiry.

for Reconsideration of an award for compensation <u>must</u> be filed within ten (10) days from the date

of the order awarding compensation or it will be denied summarily on that basis"). Here, more than

ten days elapsed between the date of the entry of the judgment and the date upon which the motion

to alter judgment was filed. Therefore, the Court rejects Defendants' argument and affirms the

decision of the Bankruptcy Court.


**III.    CONCLUSION**

For the foregoing reasons, the Court affirms the Bankruptcy Court's decision in part and

remands in part for clarification or amendment in accord with this opinion. An appropriate form of

Order accompanies this Opinion.


Dated: November 24, 2009


                                               s/ Garrett E. Brown, Jr.
                                            GARRETT E. BROWN, JR., U.S.D.J.